UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
98 FEB -6 PM 1: 15
U.S. DISTRICT COURT
N.D. OF ALABAMA

MICHAEL KEVIN AUSTIN, }
  }
    Plaintiff, }
  }
                        }    CIVIL ACTION NO.
    vs.                 }
                        }    CV-96-AR-1240-E
NORTHEAST ALABAMA KIDNEY }
CLINIC, }
  }
    Defendant. }

ENTERED
FEB 6 1998

**MEMORANDUM OPINION**

The court has before it the motion of defendant, Northeast Alabama Kidney Clinic ("NEAKC"), for summary judgment in the above-entitled cause. Plaintiff, Michael Kevin Austin ("Austin"), a black male formerly employed by NEAKC, alleges that NEAKC violated the Civil Rights Act of 1964, *as amended*, the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and 42 U.S.C. §§ 1981 and 1981a ("§ 1981" and "§ 1981a") by failing to promote him, by failing to provide him with technical training, and by discharging him, all on account of his race. In a related claim, Austin also alleges that NEAKC retaliated against him for complaining about racial harassment. For the reasons set out more fully below, the court concludes that summary judgment is appropriate on all but Austin's retaliation and discharge claims.

### I. *Pertinent Undisputed Facts*

NEAKC is a private provider of dialysis services in Calhoun County, Alabama. It operates two facilities in that area. One facility is located in Anniston, Alabama (the "Anniston clinic") and the other in Talladega, Alabama (the "Talladega clinic"). Austin Dep. at 22-23.

Austin graduated from high school in 1974. Id. at 11. Following high school, he received three years of commercial art training. Id. After art school, Austin entered the military, where he served for five years. Id. at 14. While in the military, Austin received training in equipment repair and personnel management. Id. at 11. In 1982, Austin became a full-time student at Gadsden State Community College; however, he left that school in 1984 prior to completing a degree. Id. at 15.

Austin began working at NEAKC's Anniston clinic in September, 1987, as a Dialysis Technician. Exh. 2 to Jackson Decl. As a Dialysis Technician, Austin's primary responsibility was, in essence, to clean, prepare, and set up the equipment used for dialysis procedures. Austin Dep. at 18, 20-21. Apparently, the position also required Austin to perform some basic repairs and maintenance on the dialysis and other related equipment. Id. at 93-94. Austin served in this capacity until his discharge on April 8, 1994. Pl. Exh. 7. From November, 1990, until his

2

discharge, Mr. Joe Scroggs ("Scroggs"), NEAKC's Chief Technician, was Austin's immediate supervisor.

From all indications, it seems that Austin was, by and large, a good employee. Ms. Sherlyn Jackson ("Jackson"), NEAKC's Administrator, testified that Austin "did a very good job technically" and that his "technique was superior." Jackson Dep. at 22. Likewise, Scroggs testified that "the quality of [Austin's] work was good." Scroggs Dep. at 49.

However, Austin's tenure at NEAKC was not without incident. In March, 1993, Austin received a written warning for failing to complete his duties in a timely fashion. Exh. 1 to Scroggs Decl. Following this warning, Austin submitted a handwritten response on March 10, 1993. Exh. 2 to Scroggs Decl. In his response, titled "Employee Comments," Austin refuted the allegation that he had not performed in a timely fashion and warned that "any further unfounded adverse counselings and or [sic] correspondence during my tenure will be viewed as pure harassment." Id. On March 21, 1993, officials at NEAKC, including Scroggs and the clinic's director, Dr. David Zinn ("Zinn"), held a meeting with Austin to discuss the concerns raised in his response. As a result of this meeting, Zinn decided to withdraw the warning that Austin received on March 5, 1993. Exh. 1 to Zinn Decl. Later that year, Austin was transferred to the Talladega clinic, where

3

he worked until his discharge. Austin Dep. at 23.

In August, 1993, NEAKC hired Michael Tow ("Tow") to fill the newly created position of Biomedical Technician. Exh. 2 to Jackson Decl. In this position, Tow's primary function was the repair and maintenance of the clinic's dialysis and other related equipment. NEAKC uses at least two different type of dialysis equipment — the Baxter 550 and the Fresinius A-2008. In January, 1994, NEAKC sent Tow to California to receive training on the Fresinius equipment, as it had done with other higher-level technicians in the past.

In March, 1994, Austin requested a meeting with Zinn, Scroggs, and others to discuss why he had not been allowed to attend the Fresinius training along with Tow. Zinn Decl. at ¶ 3. According to Austin, at this meeting, he asked why he repeatedly had been denied the opportunity to attend Fresinius training and complained that he was experiencing racial discrimination at the clinic. Austin Decl. at ¶ 31. Zinn claims that he told Austin that rumors about Austin going to work for a competing dialysis clinic factored into the decision to send only Tow to the training. Zinn Decl. at ¶ 3.

In or around early 1994, Austin contacted the Baxter machine sales representative, Dan Pommer ("Pommer"), and requested a copy of a $250 technical manual for Baxter machines. Austin Dep. at

4

163; Pommer Decl. at ¶ 6. Apparently, this request was unusual because it prompted Pommer to contact Scroggs in order to confirm it. Pommer Decl. at ¶ 9. According to Pommer, Scroggs told him to disregard Austin's request. Id. Scroggs immediately contacted Austin, who admitted that he made the request. Austin Dep. at 163; Scroggs Dep. at 66. Scroggs claims that, at this time, he instructed Austin not to request a Baxter technical manual from Pommer again. Scroggs Dep. at 66-67. Austin denies that Scroggs gave him that instruction. Austin Dep. at 163.

In April, 1994, Pommer again contacted Scroggs and informed him that Austin had complained to Pommer's supervisor about not receiving the manual that he had requested earlier. Pommer Decl. at ¶ 12. After speaking with Pommer, Scroggs advised Jackson of the situation. Scroggs Decl. at ¶ 4. Following his discussion with Jackson, Scroggs decided to discharge Austin. Id.

As noted above, Austin was discharged on April, 8, 1994, for "disobeying his direct supervisor and embarrass[ing] the company." Pl. Exh. 7. On April 14, 1994, Austin filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Pl. Exh. 8. This lawsuit followed.

5

## II. *Summary Judgment Standard*

Rule 56 states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), Fed.R.Civ.P. In addition, the Eleventh Circuit has observed that "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). NEAKC has invoked Rule 56.

## III. *Discussion*

As an initial matter, the court concludes that all of Austin's claims brought pursuant to § 1981 are due to be dismissed as a matter of law for two reasons. First, claims for discriminatory discharge are not cognizable under § 1981. Vance v. S. Bell Tel. & Tel. Co., 983 F.2d 1573, 1576 (11th Cir. 1993); Pearson v. Macon-Bibb County Hosp. Auth., 952 F.2d 1274, 1277-78 (11th Cir. 1992). Second, Austin's § 1981 claims are not timely. It is well settled that, in Alabama, the applicable statute of

limitations for § 1981 claims is two years.¹ See <u>Peterson v. BMI Refractories</u>, 1998 WL 9164 at *8 n.16 (11th Cir.) (applying two-year statute of limitations to Alabama § 1981 action). Notwithstanding Austin's protestations to the contrary, nothing in the Civil Rights Act of 1991 alters this fact. See <u>Vance</u>, 983 F.2d at 1577 (discussing prospective nature of 1991 amendments to Title VII and § 1981). Therefore, given that Austin filed this action more than two years after his discharge, he has failed to comply with the statute of limitations applicable to his § 1981 claims.² Accordingly, NEAKC is due to receive summary judgment as to Austin's claims brought pursuant to that statute. For the balance of this opinion, the court will address Austin's claims as though they are brought pursuant to Title VII and § 1981a only.

### A. Austin's Retaliation Claim

Austin alleges that NEAKC retaliated against him for complaining about racial discrimination at the March, 1994, meeting with Zinn and Scroggs. NEAKC refutes this allegation by

---

¹ Section § 1981 does not contain its own statute of limitations. Consequently, federal courts determine the statute of limitations for § 1981 actions by applying the statute of limitations for personal injury claims provided by state law. <u>Goodman v. Lukens Steel Co.</u>, 482 U.S. 656, 661, 107 S.Ct. 2617, 2621 (1987). The statute of limitations for personal injury actions in Alabama is two (2) years. ALA. CODE § 6-2-38 (1) (1993).

² Recall, NEAKC discharged Austin on April 8, 1994. He filed his complaint on May 8, 1996.

7

arguing that Austin cannot make establish a *prima facie* case for retaliation. NEAKC's argument is not well taken.

To establish a *prima facie* case for retaliation in violation of Title VII, Austin must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) the existence of a casual link between the protected expression and the adverse action. <u>Raney v. Vinson Guard Service, Inc.</u>, 120 F.3d 1192, 1196 (11th Cir. 1997). Moreover, the Eleventh Circuit recently explained what a plaintiff must show to make out the third element for *prima facie* retaliation by observing:

> In order to satisfy the "casual link" prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. (Citation omitted). Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action.

<u>Id.</u> at 1197 (citing <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993)). This standard reflects the Eleventh Circuit's long-standing position that the causal link requirement is to be broadly construed. <u>Meeks v. Computer Assocs. Internat'l</u>, 15 F.3d 1013, 1021 (11th Cir. 1994).

When the record evidence is viewed in the light most

8

favorable to Austin, it is clear that he can satisfy each element of the requisite *prima facie* case. First, Austin testifies in his deposition that, at the March, 1994, meeting, he complained about racial discrimination. Austin Dep. at 138. Second, it is undisputed that Austin's April, 1994, discharge constitutes an adverse employment action. Third, Scroggs, the NEAKC official that fired Austin, states in his declaration that he was present at the March, 1994, meeting at which, according to Austin's testimony, he complained of racial discrimination.[3] Scroggs Decl. at ¶ 2. Thus, there is evidence supporting the existence of a causal link between Austin's complaint and his discharge. Accordingly, as he has satisfied the elements of his *prima facie* case, the court concludes that summary judgment on his retaliation claim is inappropriate. The mere fact that Scroggs states in his declaration that Austin did not complain about racial discrimination at the March, 1994, meeting does nothing to change this conclusion. Given that Austin testifies that he did make such complaints at that time, Scroggs's declaration does nothing more than present a dispute over credibility that is better left to a jury.

---

[3] Because it complies with the requirements of 28 U.S.C. § 1746, Scroggs's unsworn declaration qualifies as admissible evidence as to this fact.

### B. Austin's Discriminatory Discharge Claim

Austin also alleges that his discharge for insubordination was racially motivated. More specifically, Austin claims that, by failing to give him some kind of warning prior to his discharge, NEAKC disciplined him more severely than it did other white employees who were also insubordinate. Although it is more precise to describe this claim as one for disparate treatment in workplace discipline, both parties refer to it as Austin's "discharge" claim. To minimize confusion, the court will do the same.

The United States Supreme Court first articulated the *prima facie* case for disparate treatment in employment settings in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). The Court later refined this standard in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (1981). Over the years, courts have adapted the McDonnell Douglas-Burdine model to analyze varying types of employment discrimination claims. For example, in order to make out a *prima facie* case for disparate treatment in workplace discipline, an employee must demonstrate: (1) that he is a member of the class protected by Title VII; and either (2) that he did not violate the work rule in question; or (3) that he engaged in misconduct similar to that of a person outside the protected class and the

10

disciplinary measures taken against him were more severe than those taken against the nonminority. Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989). If Austin establishes a *prima facie* case for disparate treatment in workplace discipline, then the burden of production shifts to NEAKC to establish evidence of a legitimate, nondiscriminatory reason that explains why it took the employment action that it did. See Armstrong v. Flowers Hosp., 33 F.3d 1308, 1313 (11th Cir. 1994). Finally, if NEAKC meets this exceedingly light burden, then the burden shifts to Austin to show that the reason given by the clinic is, in fact, a pretext for discrimination. See id. at 1313-14.

Initially, Austin attempts to make out his *prima facie* case by showing that he did not violate the work rule in question. According to Austin, he was not insubordinate because Scroggs never instructed him not to contact Pommer again. However, as NEAKC correctly observes, even if this claim is true, it is unavailing for Austin because Scroggs had a good faith belief that Austin disobeyed his instructions. As the Eleventh Circuit has explained:

> The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.

Jones, 874 F.2d at 1540; see Nix v. WLCY Radio/Rahall

11

Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (explaining that "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). As there is clear evidence that Scroggs believed Austin was insubordinate, the fact that he now disputes this charge does not create a jury issue. Id.

Austin also tries to make out a *prima facie* case by showing that NEAKC treated him more severely than it did Jon Dukes ("Dukes"), a white employee who was also discharged for being insubordinate. More specifically, Austin claims that, prior to Dukes's discharge, NEAKC gave him several warnings, both verbal and written, concerning his insubordination. Pl. Exh. 13 and 15. On the other hand, Austin claims he received no warnings prior to his own discharge.

In response, NEAKC argues that Austin and Dukes did not engage in similar misconduct — Dukes continually directed racial slurs at black coworkers whereas Austin attempted to obtain a technical manual after being told not to do so. NEAKC's argument is unpersuasive. It is undisputed that the clinic essentially fired both Austin and Dukes for insubordination. In fact, when asked, Scroggs testified that he discharged Austin and Dukes for failing to comply with his direct orders. Scroggs Dep.

at 22-23, 58. In the court's view, the fact that the employees disobeyed different orders is of no moment. Therefore, the court concludes that Austin has made out a *prima facie* case on his discharge claim.

However, by articulating a legitimate, nondiscriminatory reasons for discharging Austin, NEAKC has successfully rebutted his *prima facie* case. The record clearly indicates that the clinic discharged Austin because he "disobeyed his direct supervisor." Pl. Exh. 7. As discussed above, the burden now shifts to Austin to show that this reason is merely a pretext for race discrimination.

To establish pretext, Austin "has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). As evidence of pretext, Austin points to the fact that NEAKC's policy normally requires that an employee receive some type of warning prior to being discharged for insubordination. Jackson Dep. at 84. He also points to the fact that Dukes received multiple warnings prior to his discharge. There is no indication that Austin received any such warning.

13

Although it is a close call, when the evidence is viewed in the light most favorable to Austin, the court concludes that he has created a jury issue as to pretext. NEAKC offers no explanation for why Austin and Dukes received different degrees of leniency. Considering that Dukes's continued use of racial slurs subjected the clinic to far more potential liability than Austin's repeated requests for a $250 technical manual, and that the clinic appears to have appreciated that fact, it is possible that a jury would find that something other than the specific circumstances surrounding Austin's insubordination motivated NEAKC's decision to discharge him. Therefore, as per Combs, summary judgment is not appropriate on his discharge claim.

### C. Austin's Failure to Promote and Training Claims

Lastly, Austin alleges that he experienced disparate treatment with respect to promotional and training opportunities on eight separate occasions. More specifically, he claims that, as a result of racial discrimination, he failed to receive promotions to positions awarded to Mary Austin, George Dudchock ("Dudchock"), Scroggs, and Tow. He also claims that, due to his race, he was denied Fresinius training that the clinic provided to each of these individuals. In response, NEAKC argues that most of these claims are time-barred. The court agrees.

In order to bring a claim under Title VII, an employee must

14

file a charge of discrimination with the EEOC within 180 days of the challenged employment action. 42 U.S.C. § 2000e-5(e). In effect, this requirement acts like a statute of limitations, and it shields an employer from liability for any improper employment practice occurring more than 180 days prior to the filing of the EEOC charge. Larkin v. Pullman-Standard Div., Pullman, Inc., 854 F.2d 1549, 1561-62 (11th Cir. 1988). Consequently, in the instant case, because Austin filed his EEOC charge on April 14, 1994, any claim regarding an incident of alleged discrimination occurring before October 16, 1993, is untimely. Pl. Exh. 8. It is undisputed that, of Austin's promotion and training claims, only one of the challenged decisions — NEAKC's decision to provide Tow with Fresinius training in January, 1994 — occurred after October 16, 1993.[4] Therefore, this is the only one of Austin's promotion and training claims on which the court can allow him to proceed (hereinafter the "January, 1994, training claim").[5]

---

[4] Mary Austin received her promotion to Machine Technician in 1988. Pl. Exh. 4. Dudchock entered his contract with NEAKC in or about March, 1990. Pl. Exh. 16. NEAKC hired Scroggs in November, 1990. Exh. 2 to Jackson Decl. NEAKC hired Tow in August, 1993. Id. It is undisputed that Mary Austin, Dudchock, and Scroggs all received Fresinius training prior to October, 1993.

[5] In an attempt to circumvent the 180-day deadline, Austin attempts to characterize all of his promotion and training claims as a "continuing violation." To determine the existence of a continuing violation, courts examine the following factors: (1) the subject matter of the discrimination; (2) the frequency of the discrimination; and (3) the degree of permanence associated with the discrimination. Patterson v. Augat Wiring Sys., Inc., 944 F. Supp. 1509, 1517 (M.D.Ala. 1996). Of these factors, the degree of

In order to establish a *prima facie* case for discriminatory denial of training, an employee must demonstrate: (1) that he is a member of the protected class; (2) that he was qualified for the position in question; (3) that he was denied training for that position; and (4) that, after he was denied the training, the employer afforded it to a similarly situated person from without the protected class. See <u>Tyler v. Runyon</u>, 70 F.3d 458, 467 (7th Cir. 1995) (outlining *prima facie* case for denial of training). NEAKC argues that, because Austin cannot show that he and Tow were similarly situated, he cannot make out his *prima facie* case for the January, 1994, training claim. This argument is well taken for several reasons.

First, the record makes clear that Austin and Tow had different responsibilities. As a Biomedical Technician at NEAKC, Tow's principal responsibility was the repair and maintenance of

---

permanence is "perhaps of most importance." <u>Berry v. Bd. of Supervisors of Louisiana State Univ.</u>, 715 F.2d 970, 981 (5th Cir. 1983). This factor considers whether the alleged violation should have triggered an employee's awareness of his rights under Title VII. <u>Id</u>.

In the instant case, the high degree of permanence is fatal to Austin's continuing violation argument. Austin states in his declaration that, from the time NEAKC promoted Mary Austin, he complained to officials at the clinic that he was being denied promotions and training **because of his race**. Austin Decl. at ¶ 29. Thus, it is clear that Austin knew of possible violations of his rights as early as 1988. As the Eleventh Circuit once explained, "[a] claim arising out of an injury which is 'continuing' only because [an employee] knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." <u>Roberts v. Gadsden Mem'l Hosp.</u>, 850 F.2d 1549, 1550 (11th Cir. 1988). Therefore, the court concludes that Austin's promotion and training claims do not constitute a continuing violation of Title VII. Given that Austin claims that he complained of racial discrimination since 1988, his use of <u>Glass v. Petro-Tex Chem. Corp.</u>, 757 F.2d 1554 (5th Cir. 1985), is inapposite and unpersuasive.

16

dialysis and other related equipment. Exh. 1 to Jackson Decl. In contrast, Austin testified that he spent only thirty (30) percent of his time maintaining and repairing dialysis equipment. Austin Dep. at 93-94. Obviously, the mere fact that two employees perform **some** of the same functions does not, without more, make them similarly situated. Second, to the extent that Austin and Tow both performed repairs, there has been no showing that the repair work was of a similar nature. In fact, the record suggests that the repair work performed by a Biomedical Technician requires some advanced training in electronics and, thus, that it is more sophisticated than that performed by a Dialysis Technician. Scroggs Dep. at 30-34; Exh. 1 to Jackson Decl. Third, by claiming that NEAKC discriminated against him by failing to **promote** him to the position held by Tow, Austin has, in effect, conceded that he and Tow were not similarly situated. Therefore, the court concludes that Austin has failed to make out the requisite *prima facie* case for his January, 1994, training claim. The fact that Scroggs testified that Austin could have performed more sophisticated equipment repair with additional training does nothing to undermine this conclusion.

    As the balance of Austin's promotion and training claims fall outside the prescribed limitations period, the court concludes that summary judgment is appropriate on all of his said

claims.

## IV. *Conclusion*

Notwithstanding the foregoing, the court wishes to emphasize that Austin has yet to prove his case. This opinion merely reflects the court's view that, with respect to some of his claims, there are material fact issues for which summary judgment is inappropriate. Obviously, whether Austin can convince a jury to agree with him is another matter entirely.

The court will enter a separate and appropriate order in accordance with this memorandum opinion.

DONE this 6th day of February, 1998.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE